## IN THE UNITED STATES DISTRICT COURT FOR THE
## MIDDLE DISTRICT OF TENNESSEE
## NASHVILLE DIVISION

| | | |
|---|---|---|
| **ROBERT JASON BURDICK, #454219,** | ) | |
| | ) | |
| **Petitioner,** | ) | |
| | ) | |
| **v.** | ) | **NO. 3:21-cv-00602** |
| | ) | |
| **WARDEN MARTIN FRINK,** | ) | **JUDGE CAMPBELL** |
| | ) | |
| **Respondent.** | ) | |

## <u>MEMORANDUM OPINION</u>

### I. INTRODUCTION

Around the turn of the 21st century, a series of rapes was committed in Davidson and Williamson Counties and attributed to a single at-large suspect, nicknamed "the Wooded Rapist." Beginning in 2008, Petitioner Robert Jason Burdick was prosecuted and convicted of those crimes. Petitioner has filed this pro se action for Writ of Habeas Corpus under 28 U.S.C. § 2254, challenging one such conviction: his 2010 conviction in Williamson County Criminal Court on charges of aggravated rape and especially aggravated kidnapping, crimes which he committed in 1999. (Doc. No. 1.) After Petitioner filed an Amended Petition (Doc. No. 11), Respondent filed the state-court record (Doc. Nos. 15–17) and an Answer. (Doc. No. 18.) Petitioner filed a Reply to Respondent's Answer (Doc. No. 21), completing the briefing of the issues before this Court.

For the reasons discussed below, the Court finds that an evidentiary hearing is not required to resolve this matter, as Petitioner is plainly not entitled to habeas relief. *See Stanford v. Parker*, 266 F.3d 442, 459 (6th Cir. 2001) (stating that evidentiary hearing is not required "if the record clearly indicates that the petitioner's claims are either barred from review or without merit"). His Amended Petition will be denied and this action will be dismissed with prejudice.

## II. PROCEDURAL HISTORY

On May 12, 2008, Petitioner was indicted by a Williamson County grand jury and charged, in Case Number II-CR053486, with fourteen crimes related to a series of rapes that occurred between 1999 and 2004. (Doc. No. 15-1 at 4–9.) The trial court granted Petitioner's motion to sever these fourteen counts of indictment so as to hold separate trials concerning each of three alleged criminal episodes. (*See id.* at 52–59.) Counts nine and ten—pertaining to the same victim, who was a minor at the time of the crimes identified by the initials E.M.—were tried to a jury in May 2010. The jury found Petitioner guilty of the 1999 aggravated rape and especially aggravated kidnapping of E.M. Petitioner was subsequently sentenced by the trial court to 25 years on each count, to be served consecutively to one another and to sentences imposed by the Davidson County Criminal Court in other proceedings against Petitioner. (Doc. No. 15-4 at 118–19.)

Plaintiff appealed the convictions on Counts 9 and 10 to the Tennessee Court of Criminal Appeals (TCCA). *State v. Burdick*, No. M2011-01299-CCA-R3CD, 2012 WL 2151489 (Tenn. Crim. App. June 13, 2012). The TCCA affirmed, and the Tennessee Supreme Court denied Petitioner's application for permission to appeal. Petitioner then instituted post-conviction proceedings in the trial court, raising claims including the ineffective assistance of counsel. The trial court denied post-conviction relief after holding an evidentiary hearing, and Petitioner appealed. The TCCA again affirmed the trial court, finding that Petitioner received effective assistance from his trial and appellate counsel. *Burdick v. State*, No. M2020-00141-CCA-R3-PC, 2021 WL 2499313 (Tenn. Crim. App. June 18, 2021). Petitioner then timely filed his habeas petition in this Court.

# III. FACTS

The following summary of the facts is taken from the TCCA's decision on direct appeal, modified here to exclude facts not relevant to the particular habeas claims before this Court. As the TCCA summarized:

> This case arises from a series of rapes that occurred in Williamson and Davidson Counties and for which the Defendant was indicted. The cases were severed for trial, and, in this case, the Defendant was tried on charges that he committed the aggravated rape and especially aggravated kidnapping of the victim, E.M., who was sixteen years old at the time of these crimes.

> At the Defendant's trial on these charges, the parties presented the following evidence: E.M. testified that in November 1999 she was living on Foxboro Square West in Brentwood. The State asked her if that was located "here in Williamson County," and E.M. responded "Yes, Ma'am, it is." E.M. recalled that, at that time, she was sixteen years old and living with her parents. E.M., a junior at Brentwood High School taking advanced placement classes, was active in the theater department. As such, she was acting as the "student director" of the fall play, for which opening night was scheduled November 2, 1999.

> On November 1, 1999, E.M. attended dress rehearsal for the school play, leaving the rehearsal around 10:00 or 10:30 p.m. She went straight home, ate a piece of leftover Halloween candy, and fell asleep while watching television around 11:00 p.m. She awoke at around 1:30 a.m., ate a second candy bar, and then went to bed. Her bedroom was located on the first floor of her parents' townhouse. Her parents were asleep in their room located on the second floor of the townhouse. Later that night, E.M. awoke from a dream to a man, wearing a knit ski mask, pointing a gun to her temple. His right, gloved hand covered her mouth, and he said, "don't say a word, be quiet or I'll kill you." E.M. described the gun against her head as "noticeably cold," and she recalled that it was black. She also recalled that her attacker's eyes were "incredibly blue."

> E.M. said her attacker "escorted" her at gunpoint out of her bedroom and through the kitchen, where she saw that the sliding glass door was open. She said that the lock on the door could be "wiggled" open and that she and her parents usually placed a broomstick handle in the sliding door so that it could not be forced open. The broomstick, however, was not placed in the door that night. E.M.'s attacker took her out the sliding glass door, reminding her not to say anything and not to scream. The attacker took her through the back patio and through the wooden gate that separated E.M.'s patio from her neighbor's patio. He took her past some detached garages and into a garage on the end farthest from her home. E.M. recalled that it was cold and raining and that she was cold wearing only panties and a T-shirt.

3

E.M. recalled that, after they entered the garage, the attacker attempted to cover her eyes with duct tape but, because her hair and face were wet, the tape did not stick. The attacker did, however, successfully cover her mouth with duct tape. The attacker told E.M. to take her clothes off, and she complied, putting her clothes on the ground. The attacker placed a rug on the ground and told her to lay down on the rug. E.M. described herself as "tense" with her "fists ... clenched." She said she was pressing her legs together because she knew "the only thing that could possibly come next." The attacker sat down beside E.M., forced his hands between her legs, and fondled her vagina. He then put his fingers inside her. The attacker then "climbed on top" of E.M., forced her legs apart, and forced his penis inside her. He peeled the duct tape away from her mouth and attempted to kiss her.

With the duct tape away from her mouth, E.M. asked the attacker why he was doing this, to which he responded that he had been watching her. She asked him why her, and he responded because she was "beautiful." E.M. said her attacker asked her age, and she told him she was sixteen and would be seventeen in two days. He asked her name, and she gave him her first name. E.M. said she told the attacker that he had to let her go because she had a school play to direct the following night. The attacker asked her if she was using birth control, and she said no. E.M. said she asked the attacker if he was wearing a condom, and he said he wanted her to get pregnant.

E.M. said that she asked the attacker if she could leave. She said he got off of her and stood up. She pled with him, saying "Please, I won't look at you; can I please put my clothes back on and go?" After she asked again, the attacker said, "yes." E.M. said she put her clothes back on, walked pas[t] the attacker, and left, not knowing whether he was going to kill her. E.M. said that as she rounded the outside of the garage, she could not hear the attacker behind her, so she started running out of fear he was going to shoot her in the back. E.M. ran home, entering her yard through her back gate and going into her house through the sliding door. E.M. estimated it took her twenty seconds to get from the garage back to her home. She said she ran upstairs to her parents' bedroom and screamed that she had just been raped.

E.M. said that her mother immediately called 911 and that her father ran downstairs. Shortly thereafter, Brentwood Police Department officers arrived. E.M. gave them the duct tape that had been on her mouth. She said that she was determined to preserve any evidence, including her clothing, that could incriminate her attacker. She did not take a shower or use the restroom in an effort to preserve evidence. E.M. testified that, after speaking with officers, she went to the emergency room at Williamson County Medical Center, where Dr. Kristina McCain examined E.M.

At the emergency room, E.M. gave doctors her clothing, and they performed a rape kit on her. They told her that she would need to return in six months so that they

could perform a second HIV test on her. E.M. then changed into new clothing and went to her home where she met with her parents and Detective Tommy Campsey.

. . .

On cross-examination, . . . E.M. agreed that the entire attack took between seven and eight minutes. E.M. said she did not see the gun during the rape, and, because she did not hear the gun placed on the ground, she assumed her attacker put the gun in his pocket.

. . .

Dr. Kristina McCain, the attending physician who performed the rape kit on E.M., testified that, on November 2, 1999, she treated E.M. She said she obtained samples from E.M., following the protocols dictated by the rape kit. Dr. McCain described E.M. as "agitated" and "a little hyper" and, in the doctor's opinion, E.M. seemed as if she had been traumatized. Dr. McCain testified that, during her examination, she used a fluorescent light to examine E.M.'s body, in an effort to find secretions. The doctor identified some such secretions on E.M.'s labia, and she took a swab of them to be tested. On cross-examination, Dr. McCain testified that she did not see any visible signs of trauma to the victim. She also agreed that the victim's vaginal swab was negative for the presence of sperm.

Lieutenant Richard Hickey, with the Brentwood Police Department, testified that he responded to the 911 call in this case. . . . Lieutenant Hickey testified that law enforcement investigated hundreds of suspects. Some were excluded because they did not match the physical description. Others were eliminated because they were incarcerated or living out of state at the time the rape occurred. During the investigation, the Defendant's name arose as a suspect.

On cross-examination, Lieutenant Hickey testified that the rug, along with the victim's panties and t-shirt, were sent to the Tennessee Bureau of Investigation ("TBI") crime laboratory for examination. . . .

Captain Thomas E. Campsey, with the Brentwood Police Department, testified that he was the captain over the criminal investigation division for the police department. . . . Captain Campsey testified that investigators continued to follow leads in this case from 1999 until at least 2008. . . . Captain Campsey testified that, in April 2008, the Defendant's name arose as a suspect in E.M.'s rape. As part of the investigation, officers obtained and executed a search warrant of the Defendant's home.

. . .

Detective Jeff Wiser with the Metropolitan Nashville Police Department testified that he assisted in executing the search warrant on the Defendant's home. Detective

5

Wiser testified about photographs taken during the execution of the search warrant, including photographs of multiple handguns found in the Defendant's home. Police also seized and photographed several items of dark clothing from the Defendant's closet, night-vision goggles, black gloves, and a "mag" light. Detective Wiser said officers found several different condoms inside a semi-automatic gun case and also a black ski mask.

Detective Wiser said on May 1, 2008, he obtained a search warrant to take a buccal swab from the Defendant. The detective sent the swab, which involved Q-tips swabbed on the inside of the Defendant's cheek, to the TBI laboratory for analysis. The parties stipulated that the TBI laboratory analyzed the buccal swab and determined the Defendant's DNA profile.

Dr. Qadriyyah Debnam, the forensic scientist at the TBI laboratory who analyzed evidence in this case, testified that she did not find any DNA on the area rug submitted by law enforcement. The doctor did, however, find sperm and skin cells on E.M.'s panties, which she processed for DNA in 1999, when they were submitted. In 2008, after law enforcement submitted the oral swab from the Defendant and the TBI created his DNA profile, the doctor compared the Defendant's DNA with the DNA found on the panties. She determined that the DNA profile found on the panties matched the Defendant's DNA sample taken from the oral swab. The doctor testified that the probability of an unrelated individual having the same DNA exceeded the current world population. Dr. Debnam testified that she analyzed the rape kit performed on E.M. at the hospital, and she found the presence of sperm but was unable to create a DNA profile from that sperm.

*State v. Burdick*, 2012 WL 2151489, at *1–6.

On post-conviction appeal, Petitioner asserted claims "that counsel was ineffective: (1) for failing to challenge the trial court's improper application of enhancement factors during sentencing, and (2) for failing to challenge law enforcement's placement of a GPS tracking device on his vehicle." *Burdick v. State*, 2021 WL 2499313, at *1. The facts underlying those claims were summarized by the TCCA, as follows:

[At the evidentiary hearing], the Petitioner admitted that an issue about consecutive sentencing was raised on appeal, and this court remanded the case to the trial court to make findings regarding the issue. The Petitioner claimed that he did not see how the enhancement factor regarding prior criminal convictions or criminal behavior applied "since it was all under one indictment[.]" However, he acknowledged that he had cases pending in Davidson County when he was sentenced on the

6

Williamson County offenses, but he continued to allege, "[a]ll I was saying [is] it was all under that same indictment."

The Petitioner said that during the course of his proceedings, he learned that a GPS monitoring device was attached to his vehicle, but neither trial nor appellate counsel ever raised an issue about the suppression of any evidence obtained therefrom. He thought his two trials[1] concluded before the United States Supreme Court issued its opinion in *United States v. Jones*, 565 U.S. 400 (2012), holding that law enforcement could not place a GPS monitoring device on a vehicle without a warrant, but that his appeals were in the appellate pipeline when *Jones* was decided, and his attorney should have raised a Fourth Amendment claim.

On cross-examination, the Petitioner stated that counsel briefly discussed the GPS issue with him but said that the issue "hasn't been decided; it's legal, they can do this[.]" However, the Petitioner admitted that no evidence was used at trial based on the GPS device and that he was already in jail when the buccal swabs were taken from him. He simply extrapolated that the buccal swabs were fruit of the poisonous tree because the GPS device was placed on his vehicle before he was arrested.

Captain David O'Neil of the Brentwood Police Department testified that he initially became involved in the investigations involving the Petitioner in 1999 when he responded to one of the rape calls as a patrol officer. He recalled that that case was ultimately retired or dismissed at the request of the victim.

Turning to the issue about the GPS device, Captain O'Neil stated that he and his partner were part of the surveillance team "that was following [the Petitioner] around." He remembered that the Petitioner was developed as a suspect on April 27, 2008. The next day, Captain O'Neil and his partner watched the Petitioner at his place of employment and then followed him with visual surveillance to TG's Restaurant in Lavergne. After the Petitioner left the restaurant, Captain O'Neil and his partner gathered the utensils used by the Petitioner with the consent of the restaurant owner. They submitted the items to the Tennessee Bureau of Investigation ("TBI"), which confirmed that the DNA on those items matched the DNA collected of the unknown suspect in multiple rapes in Williamson and Davidson Counties. The Nashville Police Department used that information as probable cause to obtain the swabs from the Petitioner after his arrest on May 1, 2008.

Captain O'Neil testified that they placed a GPS tracker on the Petitioner's vehicle on Tuesday, April 29, 2008, the day after the utensils were collected from the restaurant. He said that *Jones* had not yet been decided, and they were acting in good faith on an older decision that said a tracking device could be placed on a

---

[1]    Following his trial on Counts 9 and 10 of the 14-count indictment, Petitioner was tried and convicted on Counts 12, 13, and 14. (*See* Doc. No. 16.) His post-conviction proceedings related to both trials/convictions were consolidated for hearing on November 26, 2019. (Doc. No. 17-9 at 56–58; Doc. No. 17-10.)

vehicle without a warrant. Captain O'Neil stated that they did not gain any information from the tracking device and were really just using it to protect the public until they could arrest the Petitioner, who was already a suspect. He said that they continued with visual surveillance during that period as well, and the purpose of the GPS was to maintain the Petitioner's location if visual surveillance was lost on him. Captain O'Neil recalled that the Petitioner had become a suspect based on the observations and efforts of Officer Hamm with the Brentwood Police Department. In light of information gathered by Officer Hamm, the Brentwood and Metro Nashville Police Departments began visually surveilling the Petitioner, which led to the collection of the utensils at the restaurant. Captain O'Neil recalled that a John Doe warrant with the suspect's DNA profile was issued in Davidson County prior to the aforementioned surveillance.

Captain O'Neil reiterated that there was no evidence gathered from use of the GPS device and that the Petitioner was identified as a suspect prior to the GPS being attached to his vehicle.

> . . .

Trial counsel [who represented Petitioner during his second trial[2]] said that she was familiar with the enhancement factors that could be used in sentencing, one of which was a defendant's prior convictions or "[p]rior criminal conduct that would have been conduct that would have occurred prior to the acts that the defendant was being sentenced [on]." At the time counsel represented the Petitioner, she was aware that he had criminal cases pending in Davidson County relating to offenses that occurred prior to the offenses that resulted in convictions in Williamson County. The Petitioner's sentencing report reflected that prior criminal activity.

Trial counsel testified that she and the Petitioner discussed the issue about the GPS device being placed on his vehicle. She recalled that *Jones* was "in the pipeline ... [and] obviously ... on [her] radar." She spoke with Captain O'Neil and another detective, as well as reviewed the discovery, before advising the Petitioner that she would not file an additional motion to suppress based on *Jones*. She explained that it was her opinion that there was no legal basis to proceed with such motion because the DNA evidence had been obtained prior to the GPS device being attached to his car and no evidence had been obtained as a result of the GPS device. Trial counsel noted that she had already filed and litigated a motion to suppress regarding the search warrant and warrantless arrest, but after her investigation she did not believe there was a basis to proceed with a motion to suppress based upon the GPS tracker. On cross-examination, trial counsel acknowledged that there was not a strategic reason for not filing a motion to suppress pursuant to *Jones* "[o]ther than there

---

[2]      Only Petitioner's counsel during his second Williamson County trial (on Counts 12, 13, and 14), Attorney Dana Ausbrooks, testified at the post-conviction evidentiary hearing. Attorney Ausbrooks was originally appointed as defense counsel for proceedings on Counts 9 and 10, but substitution of counsel was ordered early in those proceedings, when Petitioner retained attorneys Fletcher W. Long, Edward T. Farmer, Carrie W. Gasaway, and John E. Herbison. (*See* Doc. No. 15-1 at 10–25, 26–27.)

wasn't any evidence to suppress." She reiterated on redirect that she had an ethical
duty to not raise issues unsupported by evidence, "hence [she] did not file it."

*Burdick v. State*, 2021 WL 2499313, at *1–3.

## IV. CLAIMS OF THE AMENDED PETITION

The Amended Petition asserts the following claims to habeas relief:

1.     The evidence that Petitioner possessed or used a gun during the commission of the charged

crimes, as required to prove the elements of "aggravated" rape and "especially aggravated"

kidnapping, was insufficient to support the jury's verdict beyond a reasonable doubt.

2.     Petitioner received the ineffective assistance of counsel when:

(a)(1) Trial counsel[3] failed to file a motion to suppress evidence gleaned as a result of the

warrantless placement of a GPS device on Petitioner's vehicle, including the DNA later obtained

from a cheek swab following Petitioner's arrest; and (2) appellate counsel failed to challenge on

direct appeal the legality of the warrantless GPS device under *United States v. Jones*, 565 U.S. 400

(2012).

(b) Trial counsel failed to challenge the enhancement of Petitioner's sentence based upon

Davidson County convictions that had not yet become final but were pending appeal at the time

of his sentencing in Williamson County.

(c) Trial counsel failed to challenge the fact that the jury charge did not sufficiently define

the elements of especially aggravated kidnapping, pursuant to *State v. White*, 362 S.W.3d 559

(Tenn. Mar. 9, 2012).

---

[3]     The "trial counsel" whose effectiveness is at issue in this case is Petitioner's retained representation
in defense of Counts 9 and 10: Attorneys Herbison, Long, Farmer, and Gasaway.

(d) Trial counsel failed to file a proper motion to suppress the DNA evidence obtained as a result of Petitioner's unlawful arrest on May 1, 2008, which was effected pursuant to a 2006 capias warrant for the "John Doe" who matched a DNA profile attached to the warrant.

(e) Trial counsel filed an insufficient motion to suppress the fruits of an unlawful search conducted pursuant to a warrant issued on April 28, 2008.

(f) Trial counsel failed to argue as a mitigating factor at sentencing that Petitioner voluntarily released the victim alive, which Section 39-13-305(b)(2) of the Tennessee Code requires the sentencing court to consider as a mitigating factor.

(Doc. No. 1 at 5–8, 16–18; Doc. No. 11.)

## V. ANALYSIS

A. <u>Legal Standard</u>

The statutory authority of federal courts to issue habeas corpus relief for persons in state custody is provided by 28 U.S.C. § 2254, as amended by the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA). A federal court may grant habeas relief to a state prisoner "only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). Upon finding a constitutional error on habeas corpus review, a federal court may only grant relief if it finds that the error "had substantial and injurious effect or influence" upon the conviction. *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993); *Peterson v. Warren*, 311 F. App'x 798, 803–04 (6th Cir. 2009).

AEDPA was enacted "to reduce delays in the execution of state and federal criminal sentences, particularly in capital cases . . . and 'to further the principles of comity, finality, and federalism.'" *Woodford v. Garceau*, 538 U.S. 202, 206 (2003) (quoting *Williams v. Taylor*, 529 U.S. 362, 436 (2000)). AEDPA's requirements "create an independent, high standard to be met

10

before a federal court may issue a writ of habeas corpus to set aside state-court rulings." *Uttecht v. Brown*, 551 U.S. 1, 10 (2007) (citations omitted). As the Supreme Court has explained, AEDPA's requirements reflect "the view that habeas corpus is a 'guard against extreme malfunctions in the state criminal justice systems,' not a substitute for ordinary error correction through appeal." *Harrington v. Richter*, 562 U.S. 86, 102–03 (2011) (quoting *Jackson v. Virginia*, 443 U.S. 307, 332 n.5 (1979)). Prior to the passage of AEDPA, district courts applied de novo review to determine whether "the relevant state court had erred on a question of constitutional law or on a mixed constitutional question." *Williams v. Taylor*, 529 U.S. 362, 402 (2000) (O'Connor, J., concurring). But now, where state courts have ruled on the merits of a claim, AEDPA imposes "a substantially higher threshold" for obtaining relief than a de novo review of whether the state court's determination was incorrect. *Schriro v. Landrigan*, 550 U.S. 465, 473 (2007) (citing *Williams*, 529 U.S. at 410).

Specifically, a federal court may not grant habeas relief on a claim rejected on the merits in state court unless the state decision was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," 28 U.S.C. § 2254(d)(1), or "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding," *id.* § 2254(d)(2). The Supreme Court has repeatedly held "that AEDPA, by setting forth [these] necessary predicates before state-court judgments may be set aside, 'erects a formidable barrier to federal habeas relief for prisoners whose claims have been adjudicated in state court.'" *White v. Wheeler*, 577 U.S. 73, 77 (2015) (quoting *Burt v. Titlow*, 571 U.S. 12, 19 (2013)).

A state court's legal decision is "contrary to" clearly established federal law under Section 2254(d)(1) "if the state court arrives at a conclusion opposite to that reached by [the

11

Supreme] Court on a question of law or if the state court decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts." *Williams*, 529 U.S. at 412–13. An "unreasonable application" under this subsection occurs when "the state court identifies the correct legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." *Id.* at 413; *White v. Woodall*, 572 U.S. 415, 426 (2014). A state court decision is not unreasonable under this standard simply because the federal court, "in its independent judgment," finds it erroneous or incorrect. *Williams*, 529 U.S. at 411. Rather, to be actionable under Section 2254(d)(1), the state court's decision "'must be objectively unreasonable, not merely wrong; even clear error will not suffice.'" *Woods v. Donald*, 575 U.S. 312, 316 (2015) (quoting *Woodall*, 572 U.S. at 419). An objectively unreasonable decision is one "so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Harrington*, 562 U.S. at 103.

Similarly, a district court on habeas review may not find a state court factual determination to be unreasonable under Section 2254(d)(2) simply because it disagrees with the determination. *Young v. Hofbauer*, 52 F. App'x 234, 237 (6th Cir. 2002). Rather, the determination must be "objectively unreasonable in light of the evidence presented in the state-court proceeding." *Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003). "If reasonable minds reviewing the record might disagree about the finding in question, on habeas review that does not suffice to supersede the trial court's . . . determination." *Brumfield v. Cain*, 576 U.S. 305, 314 (2015) (quoting *Wood v. Allen*, 558 U.S. 290, 301 (2010)) (internal quotation marks omitted). Moreover, a state court's factual determinations "shall be presumed to be correct" and the petitioner bears "the burden of rebutting the presumption of correctness by clear and convincing evidence." 28 U.S.C. § 2254(e)(1); *see also Davis v. Ayala*, 576 U.S. 257, 271 (2015) ("State-court factual findings . . . are presumed

correct; the petitioner has the burden of rebutting the presumption by 'clear and convincing evidence.'") (quoting *Rice v. Collins*, 546 U.S. 333, 338–39 (2006)). Finally, the petitioner may not prevail under Section 2254(d)(2) simply by showing that a fact was unreasonably determined; he "must show that the resulting state court decision was 'based on' that unreasonable determination." *Rice v. White*, 660 F.3d 242, 250 (6th Cir. 2011).

AEDPA's standard for granting relief on a claim rejected on the merits by a state court "is a 'difficult to meet' and 'highly deferential standard for evaluating state-court rulings, which demands that state-court decisions be given the benefit of the doubt.'" *Cullen v. Pinholster*, 563 U.S. 170, 181 (2011) (quoting *Richter*, 562 U.S. at 102, and *Woodford v. Visciotti*, 537 U.S. 19, 24 (2002) (per curiam)). This standard "was meant to be" a high hurdle for petitioners, consistent with the principle that habeas corpus functions as a guard against only "extreme malfunctions" in the state's administration of criminal justice. *Harrington*, 562 U.S. at 102; *see also Woods*, 575 U.S. at 316.

Review under AEDPA is not only demanding, but also ordinarily unavailable to state inmates who have not fully exhausted their remedies in the state court system. Title 28 U.S.C. Sections 2254(b) and (c) provide that, subject to certain exceptions, a federal court may not grant a writ of habeas corpus on behalf of a state prisoner unless the prisoner has presented the same claim sought to be redressed in a federal habeas court to the state courts. *Pinholster*, 563 U.S. at 182; *Kelly v. Lazaroff*, 846 F.3d 819, 828 (6th Cir. 2017) (quoting *Wagner v. Smith*, 581 F.3d 410, 417 (6th Cir. 2009)) (federal claim is exhausted if it was presented "under the same theory" in state court). This rule has been interpreted by the Supreme Court as one of total exhaustion, *Rose v. Lundy*, 455 U.S. 509 (1982), meaning that, as of the time of the habeas petition's filing, there can no longer be any available state remedy for any of its claims; if a state remedy is available for any

habeas claim, the entire petition is subject to dismissal or, in limited circumstances, to stay and abeyance while the unexhausted claim is pursued in state court. *Rhines v. Weber*, 544 U.S. 269, 275–78 (2005). A habeas petition is thus fully exhausted if each and every claim was first fairly presented to the state appellate court[4] as a federal constitutional claim in substance, if not explicitly. *See Gray v. Netherland*, 518 U.S. 152, 162–63 (1996); *Pillette v. Foltz*, 824 F.2d 494, 496 (6th Cir. 1987) (requiring the presentation of "the legal and factual substance of every claim to all levels of state court review").

However, because the exhaustion requirement "refers only to remedies still available at the time of the federal petition," it may also be "satisfied if it is clear that [the habeas petitioner's] claims are now procedurally barred under [state] law." *Gray*, 518 U.S. at 161 (citations and internal quotation marks omitted). The doctrine of procedural default is thus a corollary to the rule of exhaustion, one which ordinarily bars habeas review of claims that were not "fairly presented" for merits review in state court, either because they were presented in a way that failed to comport with state procedural rules or because they were not presented at all and no longer can be presented under state law. *O'Sullivan v. Boerckel*, 526 U.S. 838, 848 (1999) (acknowledging "the interplay of these two doctrines" and stating that, to avoid an end-run around the exhaustion requirement and "the values that it serves," "we ask not only whether a prisoner has exhausted his state remedies, but also whether he has *properly* exhausted those remedies, i.e., whether he has fairly presented his claims to the state courts") (emphasis in original; internal citations and quotation marks omitted). If the state court decides a claim on "adequate and independent state grounds"— typically a procedural rule prohibiting the state court from reaching the merits of the constitutional

---

[4]     In Tennessee, the Court of Criminal Appeals is the highest appellate court to which appeal must be taken in order to properly exhaust a claim. *See* Tenn. Sup. Ct. R. 39; *Adams v. Holland*, 330 F.3d 398, 402–03 (6th Cir. 2003).

14

claim—the claim will ordinarily be barred from federal habeas review because of its procedural default. *Wainwright v. Sykes*, 433 U.S. 72, 81–82 (1977*); see also Walker v. Martin*, 562 U.S. 307, 315 (2011) ("A federal habeas court will not review a claim rejected by a state court if the decision of the state court rests on a state law ground that is independent of the federal question and adequate to support the judgment."); *Coleman v. Thompson*, 501 U.S. 722 (1991) (same). Likewise, if a claim has never been presented to the state courts, but a state-court remedy is no longer available (e.g., when an applicable statute of limitations bars a claim or state law deems the claim waived),[5] then the claim is technically (though not properly) exhausted but barred by procedural default. *Coleman*, 501 U.S. at 731–32.

If a claim is procedurally defaulted, "federal habeas review of the claim is barred unless the prisoner can demonstrate cause for the default and actual prejudice as a result of the alleged violation of federal law, or demonstrate that failure to consider the claims will result in a fundamental miscarriage of justice." *Id.* at 750. The burden of showing cause and prejudice to excuse defaulted claims is on the habeas petitioner. *Lucas v. O'Dea*, 179 F.3d 412, 418 (6th Cir. 1999) (citing *Coleman*, 501 U.S. at 754). "'[C]ause' under the cause and prejudice test must be something *external* to the petitioner, something that cannot fairly be attributed to him[,] . . . some objective factor external to the defense [that] impeded . . . efforts to comply with the State's procedural rule." *Coleman*, 501 U.S. at 753 (emphasis in original). Examples of cause include the unavailability of the factual or legal basis for a claim, interference by officials that makes

---

[5]     The Tennessee Post-Conviction Procedure Act provides that "[i]n no event may more than one (1) petition for post-conviction relief be filed attacking a single judgment"; it then establishes a one-year statute of limitations for filing that one petition. Tenn. Code Ann. § 40-30-102(a) and (c). The Act further provides that "[a] ground for relief is waived if the petitioner personally or through an attorney failed to present it for determination in any proceeding before a court of competent jurisdiction in which the ground could have been presented," unless that ground could not be presented due to unconstitutional state action, or is based on a new and retroactive constitutional right that was not recognized at the time of trial. *Id.* § 40-30-106(g).

compliance "impracticable," or attorney error that violates the right to counsel's effective assistance. *Id.* at 753–54. To establish prejudice, a petitioner "must show not merely a substantial federal claim, such that the errors at trial created a possibility of prejudice, but rather that the constitutional violation worked to his actual and substantial disadvantage." *Shinn v. Ramirez*, 596 U.S. 366, 379–80 (2022) (citations and internal quotation marks omitted); *see also Ambrose v. Booker*, 684 F.3d 638, 649 (6th Cir. 2012) (finding that "having shown cause, petitioners must show actual prejudice to excuse their default"). "When a petitioner fails to establish cause to excuse a procedural default, a court does not need to address the issue of prejudice." *Simpson v. Jones*, 238 F.3d 399, 409 (6th Cir. 2000). Likewise, if a petitioner cannot establish prejudice, the question of cause is immaterial.

Because the cause and prejudice standard is not a perfect safeguard against fundamental miscarriages of justice, the United States Supreme Court has recognized a "narrow exception" to the bar of an unexcused default in cases where a constitutional violation has "probably resulted" in the conviction of one who is "actually innocent" of the substantive offense. *Dretke v. Haley*, 541 U.S. 386, 392–93 (2004) (citing *Murray v. Carrier*, 477 U.S. 478, 495–96 (1986)); *accord Lundgren v. Mitchell*, 440 F.3d 754, 764 (6th Cir. 2006). To obtain habeas review under this narrow exception to the procedural-default rule, the petitioner would need to demonstrate his factual innocence, not the mere legal insufficiency of the State's proof; a miscarriage-of-justice claim is not supported by an assertion of mere legal innocence. *Lee v. Brunsman*, 474 F. App'x 439, 442 (6th Cir. 2012) (citing *Bousley v. United States*, 523 U.S. 614, 623 (1998), and *Calderon v. Thompson*, 523 U.S. 538, 559 (1998)).

16

B. Claims to Relief

    1. Claim 1 – Sufficiency of the Evidence

Petitioner claims that the evidence that he possessed or used a gun during the commission of the charged crimes, as required to prove the elements of "aggravated" rape and "especially aggravated" kidnapping, was insufficient to support the jury's verdict beyond a reasonable doubt. He exhausted this claim on direct appeal before the TCCA, which properly stated the applicable standard for adjudicating the sufficiency of the convicting evidence as "whether, after considering the evidence in the light most favorable to the State, 'any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" *State v. Burdick*, 2012 WL 2151489, at *11 (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)). In accord with this standard, "a reviewing court 'faced with a record of historical facts that supports conflicting inferences must presume—even if it does not affirmatively appear in the record—that the trier of fact resolved any such conflicts in favor of the prosecution, and must defer to that resolution.'" *Cavazos v. Smith*, 565 U.S. 1, 6 (2011) (quoting *Jackson*, 443 U.S. at 326)). Thus, a federal habeas court must resist substituting its own opinion for that of the convicting jury, *York v. Tate*, 858 F.2d 322, 329 (6th Cir. 1988), particularly when it comes to matters of witness credibility, which "is an issue to be left solely within the province of the jury." *Knighton v. Mills*, No. 3:07-cv-2, 2011 WL 3843696, at *6 (E.D. Tenn. Aug. 29, 2011) (citing, *e.g.*, *Deel v. Jago*, 967 F.2d 1079, 1086 (6th Cir. 1992)).

In addition to this requirement of deference to the jury verdict concerning the elements of the crime under state law, this Court must defer to the TCCA's consideration of that verdict under AEDPA. *See Tucker v. Palmer*, 541 F.3d 652, 656 (6th Cir. 2008) (stating that "the law commands deference at two levels" when adjudicating sufficiency-of-the-evidence claim). Here, the TCCA

described the statutory elements under consideration and analyzed the proof of those elements, as follows:

## 1. Aggravated Rape

As relevant to this case, aggravated rape is the unlawful sexual penetration of a victim by the defendant accompanied by force or coercion to accomplish the act, and the defendant is armed with a weapon or any article used or fashioned to lead the victim reasonably to believe it to be a weapon. T.C.A. § 39-13-502(a)(1) (2010).

The Defendant rests his contention of the sufficiency of the evidence on whether he possessed a gun during the rape, saying that [the victim's] testimony that he had a weapon was too vague. The evidence, viewed in the light most favorable to the State, proves that the Defendant, wearing a black ski mask, entered E.M.'s home while she was sleeping. He placed a gun to the side of her head and told her not to say a word or he would kill her. He then "escorted" her out of her bedroom and through the sliding glass doors, ultimately to a garage where he told her to lie down on a small area rug. The Defendant proceeded to sexually penetrate the victim. The victim testified that she assumed that the Defendant placed the gun in his pocket during the actual rape, in part because she did not hear him place it on the ground. During a search of the Defendant's home, law enforcement officers found multiple guns, a black ski mask, and condoms inside a gun case. DNA found on the victim's panties matched the Defendant's DNA profile. We conclude that this evidence sufficiently supports the Defendant's conviction for aggravated rape.

## 2. Especially Aggravated Kidnapping

As relevant to this case, especially aggravated kidnapping "is false imprisonment ... [a]ccomplished with a deadly weapon...." T.C.A. § 39-13-305(a)(1), (4) (2010). "A person commits ... false imprisonment who knowingly removes or confines another unlawfully so as to interfere substantially with the other's liberty." T.C.A. § 39-13-302(a) (2010). "'Deadly weapon' means: (A) A firearm or anything manifestly designed, made or adapted for the purpose of inflicting death or serious bodily injury; or (B) Anything that in the manner of its use or intended use is capable of causing death or serious bodily injury." T.C.A. § 39-11-106(a)(5) (2010). "'Firearm' means any weapon designed, made or adapted to expel a projectile by the action of an explosive or any device readily convertible to that use." T.C.A. § 39-11-106(a)(11) (2010).

The Defendant again contests the sufficiency of the proof supporting that he possessed a weapon when he falsely imprisoned E.M., contending E.M.'s testimony was too vague. E.M. testified that, when the Defendant came into her room on the night of the attack, he placed a black, shiny gun that was eight to ten inches in length next to her head. She said the gun felt cold against her skin. The Defendant led the victim at gunpoint outside the sliding glass doors of her home

18

and into a garage. When police officers searched the Defendant's house, they found multiple guns, including a handgun in a gym bag. This, in combination with the victim's definitive testimony about the gun, is sufficient to prove that the Defendant possessed a deadly weapon when he falsely imprisoned her. The Defendant is not entitled to relief on this issue.

*State v. Burdick*, 2012 WL 2151489, at *12–13.

Petitioner renews in this Court his argument that the victim's testimony concerning the gun was vague and uncorroborated, and therefore constitutionally insufficient to establish his possession of a gun during either crime. He frames the issue as "[w]hether or not the evidence was sufficient to establish beyond a reasonable doubt that he used a gun during the rape [and kidnapping] in order to force the victim to submit to" those crimes. (Doc. No. 2 at 18–19.) He further argues that the discovery of guns in a search of his home in 2008 does not have any evidentiary value vis-à-vis his possession of a gun in 1999, on the night of the crimes.

Regardless of the relevance (or lack thereof) of his gun-possession in 2008, Petitioner's argument that the State was required to prove that he used a gun to accomplish the act of rape—rather than simply to prove that he was "armed with a weapon or any article used or fashioned to lead the victim reasonably to believe it to be a weapon," Tenn. Code Ann. § 39-13-502(a)(1)—misses the mark. In support of this argument, he cites *State v. Mitchell*, No. C.C.A. 87-152-III, 1988 WL 32362, at *1 (Tenn. Crim. App. Apr. 7, 1988), in which the TCCA found the evidence of weapon-use insufficient with regard to the second of two rapes, the second rape having occurred in a car after the rapist had driven his victim away from the house where he first raped her, leaving his weapon behind. But in *Mitchell*, there was affirmative evidence that a weapon possessed by the rapist had been recovered at the site of the first rape, and zero evidence establishing that he had any other weapon in the car where he committed the second rape. *Id.* Conversely, the victim in the instant case testified that a gun had been held to her head in her bedroom; that she was escorted at

19

gunpoint from the residence; that she assumed the gun was in Petitioner's pocket during the rape because she had not heard him place it on the ground; and that, when she was allowed to walk past Petitioner and exit the garage where the rape occurred, "she started running out of fear he was going to shoot her in the back." *State v. Burdick*, 2012 WL 2151489, at *1–3. Considered in the light most favorable to the State, this testimony provides sufficient evidence to prove beyond a reasonable doubt that Petitioner possessed a gun (or an implement the victim believed to be a gun) in the garage where the rape occurred.

In his briefing, Petitioner repeatedly emphasizes that the State failed entirely to prove that he used a gun "during the act of rape" or "during the sexual penetration." (Doc. No. 21 at 7–12.) But the statute only requires the use of "force or coercion . . . to accomplish the act," and that the accused be "armed with a weapon." Tenn. Code Ann. § 39-13-502(a)(1). The evidence in this case clearly established that force was used to accomplish the rape. Moreover, the TCCA has clarified that "the element of being armed with a weapon" in an aggravated rape case "is satisfied when a defendant has a weapon in his actual or constructive possession"; the law "does not require that a defendant employ the weapon or directly threaten the victim with the weapon." *State v. Jones*, No. M2015-00720-CCA-R3-CD, 2016 WL 3621513, at *6 (Tenn. Crim. App. June 29, 2016) (citing *State v. Moore*, 703 S.W.2d 183, 186 (Tenn. Crim. App. 1985)).

Nor did the victim's testimony need to be corroborated in order to be credited. The jury was entitled to rely exclusively on that testimony to find that Petitioner was in possession of a weapon when he raped the victim. *See State v. Smith*, 42 S.W.3d 101, 106 (Tenn. Crim. App. 2000) (stating that "there is no requirement that the [rape] victim's testimony be corroborated," and rejecting argument regarding unreliability of victim's testimony because "t]he credibility of the witnesses, the weight to be given their testimony, and the reconciliation of conflicts in the evidence

are matters entrusted exclusively to the jury"); *see also Curtis v. Boyd*, No. 3:20-CV-00559, 2023 WL 2699973, at *41, 47 (M.D. Tenn. Mar. 29, 2023) (citing, *e.g.*, *Smith*, *supra*). While Petitioner questions the victim's ability to describe the gun's shiny, black appearance "in the dark of night" after having been "awakened from her sleep . . . in such a scared, startled state of mind" (Doc. No. 2 at 17, 23; Doc. No. 21 at 15), "[a]n attack on witness credibility does not challenge the sufficiency of the evidence, only its quality." *Curtis*, 2023 WL 2699973, at *47 (quoting *Humphrey v. Mills*, 54 F. App'x 433, 434 (6th Cir. 2002)).

As to whether Petitioner possessed a gun in the house where the kidnapping occurred, *see State v. Burdick*, 2012 WL 2151489, at *7 ("the especially aggravated kidnapping occurred in E.M.'s house"), and "accomplished" the kidnapping with that gun "or by display of any article used or fashioned to lead the victim to reasonably believe it to be a deadly weapon," Tenn. Code Ann. § 39-13-305(a)(1), the victim's testimony that Petitioner "placed a black, shiny gun that was eight to ten inches in length next to her head," and that "the gun felt cold against her skin," is sufficient to prove this aggravating element—as found by the TCCA, and for the reasons discussed above relating to the jury's province to weigh victim testimony.

In sum, this Court must defer to the jury's findings on these factual issues, and to the TCCA's reasonable determination that sufficient evidence supported those findings. Accordingly, Claim 1 has no merit.

2. Claim 2 – Ineffective Assistance of Counsel

A claim of ineffective assistance of counsel arises under the Sixth Amendment and is properly analyzed under the two-prong standard of *Strickland v. Washington*, 466 U.S. 668 (1984), which asks: (1) whether counsel was deficient in representing Petitioner; and (2) whether counsel's alleged deficiency prejudiced the defense so as to deprive Petitioner of a fair trial. *Id.* at 687. To

21

meet *Strickland*'s first prong, Petitioner must establish that his counsel's representation "fell below an objective standard of reasonableness," and must overcome the "strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, [he] must overcome the presumption that . . . the challenged action 'might be considered sound trial strategy.'" *Id.* at 688–89 (quoting *Michel v. State of La.*, 350 U.S. 91, 101 (1955)). The "prejudice" component of the claim "focuses on the question of whether counsel's deficient performance renders the result of the . . . proceeding fundamentally unfair." *Lockhart v. Fretwell*, 506 U.S. 364, 372 (1993). It requires a showing that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.*

When an exhausted claim of ineffective assistance of counsel is raised in a federal habeas petition, review under AEDPA is "doubly deferential," *Knowles v. Mirzayance*, 556 U.S. 111, 123 (2009), in that "*Strickland* requires deference to counsel and AEDPA requires deference to the state court." *Moody v. Parris*, No. 20-5299, 2022 WL 3788503, at *4 (6th Cir. Aug. 30, 2022). The question then is not whether Petitioner's counsel was ineffective; rather, "[t]he pivotal question is whether the state court's application of the *Strickland* standard was unreasonable." *Harrington v. Richter*, 562 U.S. 86, 101 (2011).

Petitioner's ineffective-assistance claim was properly exhausted only insofar as it relates to Claim 2(a)—counsel's failure to challenge evidence gleaned as a result of the warrantless placement of a GPS device on Petitioner's vehicle, including the DNA later obtained from a cheek swab following Petitioner's arrest; and Claim 2(b)—counsel's failure to challenge the enhancement of Petitioner's sentence based upon Davidson County convictions that had not yet

22

become final but were pending appeal at the time of his sentencing in Williamson County. The TCCA applied the *Strickland* standard to these claims, *see Burdick v. State*, 2021 WL 2499313, at *4, as described below.

a. Claim 2(a) – Warrantless GPS Tracking

First, with respect to the ineffective-assistance claim concerning GPS tracking, the TCCA found as follows:

> The Petitioner argues that both trial and appellate counsels rendered ineffective assistance for failing to challenge law enforcement's placement of a GPS tracking device on his vehicle without a warrant, "which ultimately led to his arrest and the taking of his DNA sample resulting in his conviction."

> In support of his argument, the Petitioner points out that while his case was in the appellate pipeline, the United States Supreme Court issued its opinion in *Jones*, 565 U.S. 400, holding that the attachment of a GPS tracking device to a defendant's vehicle constituted a search within the meaning of the Fourth Amendment thus necessitating a warrant. He claims that counsel should have challenged his arrest "based upon an unreasonable seizure of his person stemming from an illegal search" and sought to suppress "all evidence obtained from [his] person, his vehicle and his home as fruits of an unconstitutional search and seizure." He also contends that "once law enforcement lost sight [of him] visually, ... law enforcement relied upon the GPS device to locate [him] ... and did initiate a 'stop' of the vehicle and effect an 'arrest' of his person without a warrant."

> . . .

> At the post-conviction hearing, [Attorney Ausbrooks, counsel for Counts 12, 13, and 14] testified that she and the Petitioner discussed the issue about the GPS device being placed on his vehicle. She knew that *Jones* was in the appellate pipeline and was aware of its ramifications. She spoke with Captain O'Neil and another detective, as well as reviewed the discovery, before advising the Petitioner that she would not file an additional motion to suppress based on *Jones*. She explained that it was her opinion that there was no legal basis to proceed with such motion because the DNA evidence had been obtained prior to the GPS device being attached to his car, and no evidence had been obtained as a result of the GPS device. Counsel noted that she had already filed and litigated a motion to suppress regarding the search warrant and warrantless arrest, but after her investigation she did not believe there was a basis to proceed with a motion to suppress based upon the GPS tracker, and she had an ethical duty not to file a frivolous motion.

23

In ruling on this issue, the post-conviction court found that there was not an ethical basis for counsel to file a motion to suppress based on the GPS tracking device "because there was in fact no legal or factual connection between the GPS tracking and the DNA evidence.... Consequently, ... the Petitioner has failed to show that [counsel's] performance fell below the standard required for criminal defense attorneys."

The Petitioner's argument disregards the fact that no information or evidence was gathered as a result of the tracking device. The police had already obtained the Petitioner's DNA from utensils that he had used at a restaurant before the device was installed on his vehicle, and the DNA on those items matched the DNA collected of the unknown suspect in multiple rapes in Williamson and Davidson Counties. Evidence of the Petitioner's DNA was not fruit of the poisonous tree as the police had already obtained the sample before attaching the device to his vehicle. We determine that neither trial nor appellate counsel rendered deficient performance by failing to raise what would have been a frivolous claim. In addition, the Petitioner has not established prejudice because none of the evidence used to secure his arrest and convictions arose from the tracking device.

*Id.* at *5–6.

Petitioner claims "that law enforcement's placement of the GPS tracking device on his vehicle without a warrant while monitoring his every movement for a period [of] three (3) days constituted an unreasonable search," and that his subsequent arrest and buccal swab for DNA evidence is the fruit of that unreasonable search. (Doc. No. 21 at 18.) However, as Petitioner himself concedes, these subsequent events also followed the return of "DNA testing . . . on the eating utensils from Tee Gee's Restaurant" (Doc. No. 2 at 31), where he had been tracked by *visual* surveillance according to the post-conviction testimony of Captain O'Neil. (Doc. No. 17-10 at 22–23.) Thus, even if the warrantless placement of the GPS device could reasonably have been argued to be unlawful, counsel could not reasonably have believed that a motion to suppress the post-arrest DNA evidence would have succeeded, because that later evidence (obtained via buccal swab) was not the fruit of the GPS data; rather, as found by the TCCA, it was the fruit of the match between DNA left by the John Doe rape suspect and the DNA Petitioner left on his restaurant utensils, which was collected and submitted for analysis after law enforcement visually tracked

24

Petitioner to the restaurant, without the use of GPS data. *Compare United States v. Kelly*, No. 17-5110, 2017 WL 7310402, at *2 (6th Cir. Nov. 14, 2017) (rejecting argument based on allegedly unlawful search of defendant's workplace, "because no contraband was found at [his] workplace, and thus the search of his workplace had no effect on his conviction") (citing, *e.g.*, *United States v. Smith*, No. 13–5258 (6th Cir. Apr. 30, 2014) (order) (finding defendant's argument that the district court erred in denying his pretrial motion to suppress the fruits of an allegedly illegal search to be moot because no evidence from the search was used at trial)).

The record supports the TCCA's finding that the buccal-swab DNA evidence ultimately used against Petitioner at trial was secured because of his DNA identification using a previously collected sample.[6] At a minimum, the record supports the finding that the DNA evidence was not secured as a result of illegal monitoring of his location. But even if the opposite were true, and law enforcement's use of ill-gotten location data allowed (by domino effect) for the collection of DNA evidence, it is not likely that the nexus between the means used to locate Petitioner and the DNA evidence obtained from him two days later would have been found close enough to warrant exclusion of the DNA evidence as fruit of the poisonous tree. *See United States v. Williams*, 615 F.3d 657, 668–69 (6th Cir. 2010) (noting that "[t]he Supreme Court has explained . . . that not all evidence must be suppressed simply because it would not have come to light but for the illegal actions of the police"; rather, courts must inquire whether connection between illegality and evidence is attenuated by lack of temporal proximity, presence of intervening circumstances, and lack of purposeful or flagrant police misconduct) (citations omitted)); *see also United States v.*

---

[6]    As Petitioner highlights in his Reply (Doc. No. 21 at 22), Captain O'Neil testified at Petitioner's post-conviction evidentiary hearing that the DNA collected from the utensils provided probable cause for the search warrant used to obtain the buccal swab samples, which in turn yielded the DNA evidence introduced against Petitioner at trial. (Doc. No. 17-10 at 31–32.)

*Chavez-Chavez*, No. 07CR1408 WQH, 2008 WL 1847229, at *8 (S.D. Cal. Apr. 22, 2008) (stating that "[t]he nexus between the original illegality and the specific evidence subject to challenge must be a close one[;] . . . [i]t is not sufficient to demonstrate taint that . . . an illegal search uncovers the alleged perpetrator's identity and therefore directs [law enforcement's] attention to [him]"). Thus, it is clear that Petitioner was not prejudiced as a result of the unchallenged use of GPS monitoring without a warrant.

In sum, the TCCA reasonably determined that counsel was not deficient in failing to challenge the warrantless use of GPS tracking, and that Petitioner was not prejudiced thereby. Petitioner's claim to the contrary is without merit.

### b. Claim 2(b) – Sentence Enhancement

Next, as to Petitioner's ineffective-assistance claim related to sentence enhancement, the TCCA found as follows:

> The Petitioner asserts that counsel rendered ineffective assistance for failing to challenge the trial court's enhancement of his sentence based on "prior convictions" that "were nothing more than the first convictions handed down in a series of jury trials stemming from a 13-count indictment in Davidson and Williamson Counties." He notes that the trial court used his Davidson County convictions for attempted aggravated rape and especially aggravated kidnapping to enhance his sentence based on prior criminal conduct, and he acknowledges that he was convicted in this case after he was convicted for the Davidson County rapes. However, he asserts that because he had not committed new crimes or served time for the Davidson County convictions at the time of his arrest, he did not have a previous history of criminal convictions.

> This court has previously held that "trial courts can consider criminal convictions or any other criminal behavior which occurred prior to the sentencing hearing as being 'a previous history of criminal convictions or criminal behavior' under Tenn. Code Ann. § 40-35-114(1), regardless of whether the convictions or behavior occurred before or after the criminal conduct under consideration." *State v. Jordan*, 116 S.W.3d 8, 24 (Tenn. Crim. App. 2003) (internal quotation omitted). . . . According to the Petitioner's presentence report, the criminal acts committed in Davidson County took place prior to the Petitioner's sentencing in the present cases. We, therefore, conclude that counsel was not ineffective for failing to challenge the application of this enhancement factor.

26

In his reply brief, the Petitioner additionally asserts that because the Davidson County convictions had not become final and that appeal was pending at the time he was sentenced on the Williamson County convictions, those convictions could not be used to enhance his sentence. The Petitioner cites cases from Texas and Louisiana as persuasive authority for this supposition. This angle still does not entitle the Petitioner to relief. The trial court could have enhanced the Petitioner's sentence based on prior criminal convictions or criminal behavior, *see* Tenn. Code Ann. § 40-35-114(1), and the Petitioner's activities in Davidson County could certainly qualify as criminal behavior. Thus, there was no prejudice caused by counsel's not challenging the trial court's enhancement of his sentence based on "prior convictions."

*Burdick v. State*, 2021 WL 2499313, at *5.

In his Reply, Petitioner claims that the prior convictions upon which the sentencing court relied had not yet become final at the time of his sentencing, that the reliance upon them to enhance his sentence was therefore unlawful, and that trial and appellate counsel were deficient in failing to raise this challenge. Petitioner concedes that the trial court could properly have enhanced his sentence based on the criminal behavior which led the juries in his prior cases to convict him, but he argues that the applicable statute, Section 40-35-114(1) of the Tennessee Code, requires the court to enhance based on either prior (final) criminal convictions or prior criminal behavior; that "[t]he trial court in this case chose to apply previous history of convictions over behavior"; and that the court was bound by that choice and the erroneous sentence it produced. (Doc. No. 21 at 30–34; *see also* Doc. No. 2 at 50 ("The trial judge chose specifically criminal *convictions*, and is now bound by that choice." (emphasis in original)).)

Even if Petitioner's position regarding the operation of Section 40-35-114(1)—*i.e.*, that an enhancement under that section which is explicitly based only on prior "convictions" must stand or fall based on the finality of those convictions at the time of sentencing, without considering any underlying criminal behavior—were defensible under Tennessee law (and he has offered no authority, nor can the Court find any, to suggest that it is), the TCCA's rejection of his federal

constitutional claim for failure to demonstrate prejudice was clearly reasonable. In short, because the trial court could unquestionably have applied Section 40-35-114(1) to enhance Petitioner's sentence based on his prior criminal "behavior," irrespective of the finality at that time of any resulting convictions, Petitioner cannot establish that counsel's failure to challenge the enhancement prejudiced him under *Strickland*—which requires a "reasonable probability" that "the result of the proceeding would have been different" but for counsel's failure. 466 U.S. at 694. Notably, if appellate counsel had raised the matter, any error in explicitly identifying only prior convictions and not prior behavior as a basis for enhancement under Section 40-35-114(1) would have been easily corrected on *de novo* review, without producing a different result. *See State v. Nelson*, No. M2023-00176-CCA-R3-CD, 2024 WL 1192985, at *15–16 (Tenn. Crim. App. Mar. 20, 2024). This claim has no merit.

### c. Claim 2(c) – Inadequate Jury Instructions

In Claim 2(c), Petitioner asserts that trial counsel failed to challenge the jury charge's definition of the elements of especially aggravated kidnapping in light of the Tennessee Supreme Court's decision in *State v. White*, 362 S.W.3d 559 (Tenn. 2012). Petitioner concedes that he procedurally defaulted Claim 2(c), as well as his other remaining ineffective-assistance claims, by failing to raise them on post-conviction review.

Because there is no longer any available state court remedy for these claimed violations, *see* Tenn. Code Ann. § 40-30-102(c) (limiting availability of post-conviction relief to "the filing of only one (1) petition"), the claims are technically exhausted, but procedurally barred from habeas review unless Petitioner "can demonstrate cause for the default and actual prejudice" from the claimed violations, or that a fundamental miscarriage of justice will result if this Court does not consider them. *Coleman*, 501 U.S. at 731–32, 750.

28

Petitioner asserts the ineffective assistance of his post-conviction counsel as cause for the procedural default of his remaining claims. (*See* Doc. No. 2 at 67–70.) The Supreme Court has "explained clearly that 'cause' under the cause and prejudice test must be something external to the petitioner, something that cannot fairly be attributed to him." *Coleman*, 501 U.S. at 753. Attorney error is attributable to a habeas petitioner, and thus may not serve as cause for a procedural default, if the error is made at a stage of the proceedings when there is no right to counsel under the Sixth Amendment. *Id.* at 754. The Supreme Court held in *Coleman* that, because there is no constitutional right to counsel in state post-conviction proceedings, any attorney error at that stage that leads to the waiver of claims in state court "cannot constitute cause to excuse the default in federal habeas." *Id.* at 752, 757.

However, in *Martinez v. Ryan*, 566 U.S. 1 (2012), the Supreme Court modified "the unqualified statement in *Coleman* that an attorney's ignorance or inadvertence in a postconviction proceeding does not qualify as cause to excuse a procedural default," "by recognizing a narrow exception: Inadequate assistance of counsel at initial-review collateral proceedings may establish cause for a prisoner's procedural default of a claim of ineffective assistance at trial." *Id.* at 9. This exception stems from the recognition, "as an equitable matter, that the initial-review collateral proceeding, if undertaken without counsel or with ineffective counsel, may not have been sufficient to ensure that proper consideration was given to a substantial claim" of trial counsel's ineffectiveness, when that claim could not have been raised on direct appeal because of state procedural rules. *Id.* at 13. In *Trevino v. Thaler*, 569 U.S. 413 (2013), the Supreme Court extended the applicability of the *Martinez* exception to states with procedural frameworks that do not technically preclude an ineffective-assistance claim on direct appeal, but make it unlikely that the opportunity to raise that claim at that time will be a meaningful one. *Id.* at 429. The Sixth Circuit

then held in *Sutton v. Carpenter*, 745 F.3d 787 (6th Cir. 2014), that under Tennessee's procedural scheme, the initial post-conviction proceeding is the first meaningful opportunity to raise a claim of ineffective assistance of trial counsel. *Id.* at 795–96.

Thus, for each defaulted claim of ineffective assistance at trial, Petitioner may overcome the default under *Martinez* if he can show that the default resulted from his initial post-conviction counsel's ineffectiveness under *Strickland*'s standards, and that the underlying claim of trial counsel's ineffectiveness is a "substantial one, which is to say that . . . the claim has some merit." *Martinez*, 566 U.S. at 13–14. The Sixth Circuit has provided the following framework to evaluate claims under *Martinez*:

> As to these claims, the district court should determine . . . : (1) whether state post-conviction counsel was ineffective, . . . and (2) whether [Petitioner's] claims of ineffective assistance of counsel were "substantial" within the meaning of *Martinez*, *Sutton*, and *Trevino*. Questions (1) and (2) determine whether there is cause. The next question is (3) whether [Petitioner] can demonstrate prejudice. Finally, the last step is: (4) if the district court concludes that [Petitioner] establishes cause and prejudice as to any of his claims, the district court should evaluate such claims on the merits. . . . [E]ven "[a] finding of cause and prejudice does not entitle the prisoner to habeas relief. It merely allows a federal court to consider the merits of a claim that otherwise would have been procedurally defaulted." *Martinez*, 132 S. Ct. at 1320.

*Atkins v. Holloway*, 792 F.3d 654, 660 (6th Cir. 2015) (some internal citations omitted).

Whether post-conviction counsel was constitutionally ineffective is necessarily connected to the strength of the claim he failed to raise, so "in many habeas cases seeking to overcome procedural default under *Martinez*, it will be more efficient for the reviewing court to consider in the first instance whether the alleged underlying ineffective assistance of counsel was 'substantial' enough to satisfy the 'actual prejudice' prong of *Coleman*." *Thorne v. Hollway*, No. 3:14–cv–0695, 2014 WL 4411680, at *23 (M.D. Tenn. Sept. 8, 2014), *aff'd sub nom. Thorne v. Lester*, 641 F. App'x 541 (6th Cir. 2016).

30

Petitioner's claim concerning the jury instruction on the elements of especially aggravated kidnapping is not substantial. He asserts that, although the Tennessee Supreme Court had not yet decided *State v. White*—which overruled prior precedent and articulated a new model for instructing Tennessee juries in cases where kidnapping is charged along with other felonies with overlapping elements, to ensure that the demands of due process are met—trial counsel should have objected to the especially-aggravated-kidnapping jury instruction based on the rationale underlying *White*, in order to protect his due process rights. Petitioner acknowledges that the decision in *White* was handed down while his case was pending on direct appeal, but nonetheless argues that trial counsel performed deficiently in failing to present "the same or similar argument made by the attorneys for Jason Lee White," an "ordinary . . . argument which ha[d] been repeated for over 22 years at the time." (Doc. No. 21 at 38–39.) But counsel's failure to present a long-rejected argument for the Tennessee Supreme Court's reversal of its prior, binding decisions on this legal issue is a far cry from performance outside the "wide range of reasonable professional assistance" guaranteed by the Sixth Amendment. *Strickland*, 466 U.S. at 689.

In a case where, as here, the habeas petitioner's state criminal case was pending on direct appeal at the time *White* was decided,[7] the district court in *Hubbard v. Lebo*, No. 2:17-CV-02452-TLP-TMP, 2020 WL 5753199 (W.D. Tenn. Sept. 25, 2020), denied the claim "that the federal Due Process Clause requires a trial court to have instructed a jury consistent with the *White* decision while presiding over a case <u>before</u> the Tennessee Supreme Court even decided *White*," finding that the trial court committed no error in charging the jury because "[a]t the time of trial, the judge had

---

[7] The *White* court "intended retroactive application of the ruling to those already tried cases in the appellate pipeline, that is pending direct appeal, at the time it was filed and that its use of the word 'retroactive' was intended to prevent use of the ruling for collateral attack*." State v. Osby*, No. W2012-00408-CCA-R3-CD, 2012 WL 5381371, at *7 (Tenn. Crim. App. Nov. 2, 2012). However, Petitioner has not pursued a claim of trial court error under *White* in this case, but only a claim that trial counsel ineffectively failed to object to the jury charge based on the rationale underlying *White*.

no basis for giving the instruction." *Id.* at \*11–12 (emphasis in original). This reasoning applies all the more convincingly to the claim of ineffective assistance before this Court, as trial counsel simply had no legal basis for objecting to the instruction given to Petitioner's jury. The claim that trial counsel was ineffective for nevertheless failing to object is insubstantial, and its default unexcused.

### d. Claim 2(d) – Failure to Move to Suppress Based on Unlawful Arrest

Petitioner claims that trial counsel failed to file a proper motion to suppress the DNA evidence obtained as a result of his unlawful arrest on May 1, 2008, which was effected pursuant to a 2006 capias warrant for the "John Doe" who matched a DNA profile attached to the warrant. This claim is procedurally defaulted. In attempting to overcome the default, Petitioner argues that *Martinez* applies, and that post-conviction counsel was deficient in failing to raise this claim of trial counsel's ineffectiveness because there was no probable cause to believe that Petitioner was the John Doe suspect. (*See* Doc. No. 2 at 59–63; Doc. No. 21 at 44–46.)

The post-conviction attorney initially appointed to represent Petitioner, Mr. Neil Campbell, *did* present this claim during initial post-conviction proceedings, in "Petitioner's Second Amended Petition for Post Conviction Relief" filed on December 11, 2017. (Doc. No. 17-5 at 42–51, 43.) Petitioner's subsequent, retained post-conviction attorney, Mr. Douglas Trant, then filed an additional "Amendment to Petition for Post-Conviction Relief" in both Williamson County post-conviction cases on August 8, 2018 (Doc. No. 17-7 at 30–34), for the purpose of adding a claim of trial court error related to admission of unlawfully seized DNA evidence. (*Id.* at 30.) Both Mr. Trant and Petitioner certified that the latter amendment did not supplant, but "added to" the existing post-conviction petition. (*Id.* at 32–33.) The State was directed to file a response to the Amended Petition in an order captioned for filing in both post-conviction cases. (Doc. No. 17-7 at 48.) The

State filed its "Response to Amended Petitions for Post-Conviction Relief" on November 15, 2018 (Doc. No. 17-7 at 52–55) and made arguments to rebut the claims that "trial counsel was ineffective by not filing a motion to suppress [fruits of] [Petitioner's] unlawful arrest, as well as fruits of an unlawful search." (*Id.* at 53 (citing, *e.g.*, *State v. Burdick*, No. M2011-01299-CCA-R3-CD (Tenn. Crim. App. June 13, 2012).)

At the November 26, 2019 post-conviction evidentiary hearing, Mr. Trant called Petitioner as his only witness and focused his examination on "a couple of the issues that [he] raise[d] in that Post Conviction [Petition]," namely, the ineffective-assistance claims related to GPS tracking and sentence enhancement (denominated above as Claims 2(a) and 2(b)). (Doc. No. 17-10 at 8.) Otherwise, Mr. Trant briefly referred the court to "the pleadings" and "the petition" in submitting his case to the court. (*Id.* at 6, 49.) The trial court denied post-conviction relief in a ruling from the bench, announcing its decision that Petitioner had failed to show any deficiency "with respect to the two issues he raises, sentencing enhancement consideration and the not filing a Motion to Suppress related to the GPS tracking." (*Id.* at 55.) Mr. Trant did not object to this characterization of the issues before the court. The trial court's oral ruling was later incorporated into a written "Order Dismissing Post-Conviction Petition." (Doc. No. 17-8 at 48.) The order announced that the "cause came before the Court . . . on [Petitioner's] Petition and Amended Petitions for Post-Conviction Relief" on November 26, 2019, when "Petitioner raised two issues during the hearing," neither of which supported relief. (*Id.*) Petitioner expressly waived his right to an appointed post-conviction appellate attorney (*id.* at 117–120) and appealed this decision *pro se*, raising only these two issues. (*See* Doc. No. 17-30 at 7.)

It is not at all clear to this Court that Claim 2(d) was defaulted because Petitioner received the ineffective assistance of counsel on *initial* post-conviction review—as required to trigger

*Martinez*'s exception, *see Rogers v. Mays*, 69 F.4th 381, 395–96 (6th Cir. 2023)—rather than because Petitioner failed to raise the claim on post-conviction appeal. The TCCA would certainly have had jurisdiction to consider any issues that were "formally raised in the post-conviction petition or an amendment." *Lowe v. State*, No. M2022-01490-CCA-R3-PC, 2024 WL 2874148, at *10 (Tenn. Crim. App. June 7, 2024) (citation omitted). Had Claim 2(d) been raised on post-conviction appeal, the TCCA may well have found the claim waived because Petitioner (through counsel) did not develop it at the evidentiary hearing. But that outcome is by no means inescapable, particularly because the claim was not just raised in Petitioner's pleadings but argued by both parties in their pre-hearing briefing. *See Olive v. State*, No. M2023-00719-CCA-R3-PC, 2024 WL 2797015, at *7 (Tenn. Crim. App. May 31, 2024) (finding waiver where claim was "mentioned" in amended petition, but post-conviction counsel was given chance at hearing to outline claims he would be addressing and failed to include claim at issue); *Sexton v. State*, No. M2023-00320-CCA-R3-PC, 2024 WL 1617907, at *12 (Tenn. Crim. App. Apr. 15, 2024), *app. denied* (Tenn. Aug. 14, 2024) (finding ineffective-assistance claim waived "because Petitioner did not raise this issue in any of his petitions or argue the issue at the post-conviction hearing"); *see also Middlebrooks v. Carpenter*, 843 F.3d 1127, 1140 (6th Cir. 2016) (finding that ineffective-assistance claims raised in an initial post-conviction petition but not supported by proof at evidentiary hearing were not defaulted at initial review and thus "not saved by *Martinez-Trevino*," though "[s]ignificantly," the order denying post-conviction relief included a catch-all finding that such claims were "without merit" because they were "grounds upon which no proof was offered"). If Claim 2(d) was not defaulted until Petitioner failed to include it on post-conviction appeal, then post-conviction counsel's failure to explicitly assert it during the evidentiary hearing cannot supply cause excusing the default under *Martinez*, and Petitioner makes no other attempt to show cause.

Regardless, Claim 2(d) does not present a substantial claim of trial counsel's ineffectiveness. "To be substantial, an ineffective-assistance-of-trial-counsel claim must, among other things, be supported by evidence." *Rogers*, 69 F.4th at 396 (citing *Martinez*, 566 U.S. at 15–16). Petitioner does not assert any evidentiary support for Claim 2(d); he merely asserts, in conclusory fashion, that "[a]t the time of []his arrest, there was no probable cause to believe that the Petitioner was the "John Doe" alleged in the [2006 capias warrant]." (Doc. No. 1 at 17; *see also* Doc. No. 2 at 59–63, Doc. No. 21 at 44–46.) Moreover, as the State argued in its written response to this claim before the post-conviction court, "[t]he Tennessee Supreme Court addressed the 'John Doe' arrest in this case and found no error." (Doc. No. 17-7 at 53.) Indeed, in *State v. Burdick*, 395 S.W.3d 120 (Tenn. 2012), the Tennessee Supreme Court took up the question of whether the John Doe warrant identifying Petitioner's unique DNA profile was sufficient to commence the criminal prosecution against him and, once a superseding indictment was filed in Petitioner's name, to satisfy his constitutional right to notice of the charge against him. In a unanimous decision, the Tennessee Supreme Court answered that two-part question in the affirmative and affirmed Petitioner's Davidson County conviction for attempted aggravated rape. *Id.* at 121–22, 130. Accordingly, Claim 2(d) is not substantial under *Martinez*.

e. Claim 2(e) – Failure to Adequately Move to Suppress Based on Unlawful Search

In this claim, Petitioner asserts that trial counsel filed an insufficient motion to suppress the fruits of an unlawful search conducted pursuant to a warrant issued on May 1, 2008. (Doc. No. 15-4 at 20–31.) This claim, too, was raised by Attorney Campbell in Petitioner's Second Amended Petition for Post-Conviction Relief (Doc. No. 17-5 at 42, 43–46) and responded to by the State (Doc. No. 17-7 at 53) but not addressed on the merits by the post-conviction trial court or asserted on post-conviction appeal. As explained with regard to Claim 2(d), the Court is not confident that

35

*Martinez* applies to Claim 2(e). But even if it does, this ineffective-assistance claim is plainly not substantial.

Petitioner's arguments in support of this claim (Doc. No. 2 at 63–66) repeat the arguments made in the post-conviction trial court by Attorney Campbell. (Doc. No. 17-5 at 43–46.) Petitioner critiques the 14-page motion to suppress filed by trial counsel (Doc. No. 15-4 at 5–19) and asserts the legal arguments Petitioner would have offered instead of, or in addition to, the arguments made by trial counsel in that motion or at the suppression hearing. (Doc. No. 15-7.) One witness testified at the suppression hearing: Officer Elliott Hamm of the Brentwood Police Department. Officer Hamm conducted a traffic stop of Petitioner in the early morning hours of April 28, 2008, and that traffic stop yielded the facts that were offered as probable cause for the May 1, 2008 search warrant. (*See* Doc. No. 15-4 at 28–29.) The suppression motion was heard and denied by the trial court, and its denial was upheld by the TCCA on direct appeal, based on the determination that Officer Hamm's warrantless stop of Petitioner was constitutionally permissible. *State v. Burdick*, 2012 WL 2151489, at *7–11. Petitioner now claims that trial counsel was deficient in failing to argue that "Petitioner was, at most, a mere suspect in what was alleged to be an attempted car burglary" when he was stopped by Officer Hamm. (Doc. No. 2 at 63.) He further claims that trial counsel failed to (1) cite applicable Sixth Circuit cases or (2) conduct an adequate investigation into the veracity of the allegations made in the search warrant affidavit, either of which would have produced a better chance at suppression than the authorities and arguments used by trial counsel to show a lack of probable cause. (*Id.* at 64–66.)

Petitioner's contentions as to what issues trial counsel should have argued and what cases counsel should have cited fail for the same reason: counsel did in fact make the arguments Petitioner advances, even if different cases were cited to support those arguments. Petitioner

36

contends that trial counsel should have argued that the judicial authorization to search his house and person for evidence of rape was unlawful because it followed an initial detention on suspicion of an altogether different crime. He also argues that counsel should have cited certain Sixth Circuit cases—all of which found a lack of probable cause to search a residence for evidence of a crime that was disconnected, by factual context or by the passage of time, from the reason the resident was being investigated.[8] But trial counsel's suppression motion—filed, heard, and decided as a motion to exclude evidence from all proceedings under the original, 14-count indictment—pointed out that the search warrant affidavit referred to multiple rapes and other attacks that were attributed to the then-unknown "Wooded Rapist" between 1994 and 2006, only one of which occurred (in 2004) in the Meadowlake neighborhood where Petitioner was stopped by Officer Hamm, and the rest of which occurred in the Forest Hills area. (Doc. No. 15-4 at 11.) Counsel argued:

> This 2004 rape occurred about two blocks away from where a suspicious person was seen in the early morning hours of April 28, 2008. For the search warrant to be valid, the affidavit must show probable cause that Robert Burdick committed this 2004 rape, and that the searches of his person, residence, business and vehicle would uncover evidence that he did commit that crime.
>     . . .
>
> The mere fact that a man was seen on foot in the Meadowlake neighborhood early in the morning on April 28, 2008 is not probable cause that the same man committed a rape in this neighborhood in November 2004, nor that this man committed multiple rapes in the Forest Hills area between 1994 and 2006.

---

[8]     *See United States v. Hodson*, 543 F.3d 286, 292 (6th Cir. 2008) (considering defective warrant application that "established probable cause for one crime (child molestation) but designed and requested a search for evidence of an entirely different crime (child pornography)"); *United States v. Hython*, 443 F.3d 480, 486–87 (6th Cir. 2006) (finding warrant "invalid on staleness grounds" where residence alleged to be locus of drug activity, but without any indication of when such activity took place); *United States v. Laughton*, 409 F.3d 744, 747 (6th Cir. 2005) (finding a lack of probable cause where warrant application "failed to make any connection between the residence to be searched and the facts of criminal activity that the officer set out in his affidavit . . . [and] also failed to indicate any connection between the defendant and the address given or between the defendant and any of the criminal activity that occurred there"). (Plaintiff also cites *United States v. Spikes*, 158 F.3d 913 (6th Cir. 1998), for its purported finding that a search warrant application lacked indicia of recent criminal activity and was thus stale, but the application in *Spikes* was determined not to be stale because the alleged criminal activity at the residence "was of an ongoing and continuous nature." *Id.* at 924.)

In order to establish probable cause, an affidavit must set forth facts from which a magistrate can determine "whether the facts are too stale to establish probable cause at the time issuance of the warrant is sought." *State v. Vann*, 976 S.W.2d 93, 105. … While the lapse of time between the commission of a crime and the issuance of a search warrant may affect the likelihood that incriminating evidence will be found, probable cause is a case-by-case determination. . . .

The fact that a man was walking in a neighborhood late at night, even if that neighborhood has no noticeable foot traffic, does not suggest that this particular man committed a rape in the same neighborhood four years earlier. That a rape had been committed four years earlier does not suggest that the man on foot committed that earlier offense. The lengthy time span between the 2004 rape and the suspicious person seen on April 28, 2008 destroys any possible nexus between the two events.

(*Id.* at 12–14.) Thus, rather than failing to argue the disconnect between grounds for Petitioner's initial detention and the evidence targeted by the subsequent search warrant, counsel actually focused the trial court's attention on these matters. Petitioner's claim to the contrary fails.

Petitioner further claims that trial counsel failed to conduct an adequate investigation into the veracity of the allegations made in the search warrant affidavit. He asserts that an adequate investigation would have caused counsel to challenge Officer Hamm's explanation that Petitioner appeared to have "just changed" into dry clothes (which were not "dark" as the original report of a suspicious-looking person had indicated) and the corresponding suggestion that it had recently rained, when public weather reports would have shown "an absence of precipitation on April 28, 2008."[9] (Doc. No. 2 at 65.) Petitioner further asserts that trial counsel should have discovered the falsity of the affidavit's allegation that a 2005 sketch of "the Wooded Rapist" "closely resembled Robert Burdick's most recent State of Tennessee issued Driver License photograph." (*Id.*) But again, both inconsistencies—Petitioner's clothing compared to the reportedly dark clothing of the

---

[9]  The Court notes that Officer Hamm's encounter with Petitioner took place during the early morning hours of April 28, 2008. Petitioner does not make any argument that refers to public weather reports for days prior to April 28.

suspect, and his resemblance to a sketch of the man suspected of being "the Wooded Rapist"—were raised in trial counsel's suppression motion:

> When Mr. Burdick was stopped by Officer Hamm, he did not even match the description of the suspicious person described on the 911 call. … The suspicious person was described as a man about 5'7" in dark clothes with a black mask over his face. When Officer Hamm stopped Robert Burdick in his Jeep at 1:30 a.m., he described him as 5'11", 200 pounds with a muscular build, brown hair and blue eyes. He was wearing camouflage pants, with tennis shoes and a gray T-shirt. These descriptions do not match.
>
> . . .
>
> The affidavit also asserts that Robert Burdick matches the sketch of the "Wooded Rapist" done by the TBI. … [However], the TBI sketch that was done in 2005 is not incorporated into the affidavit, nor does the affidavit incorporate Robert Burdick's driver's license photograph. Thus, there is no way that a magistrate could compare the photograph of Robert Burdick with the TBI sketch of the man who attempted to rape a woman in 2005.

(Doc. No. 15-4 at 15–17.)

While Petitioner might in hindsight prefer that a finer point have been put on certain arguments for suppression, that different or additional cases have been cited, or that factual inconsistencies in the warrant application have been put under a brighter spotlight, those preferences do not support a substantial claim of ineffective assistance of counsel in this case. This defaulted claim is not saved by *Martinez*.

### f. Claim 2(f) – Failure to Argue Mitigating Factor Required by Statute

Lastly, Petitioner claims that trial counsel failed to "argue and require" that the trial court consider at sentencing the mitigating factor that the victim was voluntarily released alive—consideration which Section 39-13-305(b)(2) of the Tennessee Code mandates. (Doc. No. 11 at 3.) That Code section, which defines the crime of especially aggravated kidnapping, provides that "[i]f the offender voluntarily releases the victim alive or voluntarily provides information leading to the victim's safe release, such actions shall be considered by the court as a mitigating factor at

39

the time of sentencing." Tenn. Code Ann. § 39-13-305(b)(2). E.M., the rape and kidnapping victim in this case, was released alive. In sentencing Petitioner, the trial court found that the aggravating factor of his "previous history of criminal convictions or criminal behavior" was "established in an overwhelming way." (Doc. No. 15-14 at 50.) The court then found "that this record is void of any factor which the Court could title a mitigating factor" (*id.* at 51), and the transcript of the sentencing hearing does not reveal any explicit consideration of the fact that the victim did not escape but was allowed to return to her home after Petitioner raped her.

Even though trial counsel might ideally have objected to the court's failure to explicitly consider a statutorily required mitigating factor, this Court does not view counsel's failure to do so as an instance of deficient performance "so serious that counsel was not functioning as the 'counsel' guaranteed [his client] by the Sixth Amendment." *Strickland*, 466 U.S. at 687. More saliently though, and as Respondent argues, this claim is also insubstantial because Petitioner cannot show prejudice. As the TCCA has noted, "[t]he Sentencing Commission Comments to Subsection (b) state that the court is required to consider the voluntary safe release of the victim as a mitigating factor. This provision reflects the concern for the safety of the victim." *State v. Pipkin*, No. 01C01-9605-CR-00210, 1997 WL 749430, at *8 (Tenn. Crim. App. Dec. 4, 1997). Petitioner's claim that, after kidnapping and raping his young victim under threat of deadly violence, he released her "safely" and "unharmed" (Doc. No. 11 at 3, 7) is *manifestly* untrue. The trial court specifically found, after receiving testimony from the victim and her family, that those individuals had suffered "a huge impact" on their present and future emotional health as a result of "the loathsome way that [Petitioner] treated the victim." (Doc. No. 15-14 at 48, 53.) The court in *Pipkin* cited such a confluence of rape, use of a deadly weapon, and resulting emotional trauma to a young victim to find that, "[e]ven if applicable, this mitigating factor" of voluntary release of

40

the victim alive under § 39-13-305(b)(2) "would be entitled to little, if any, weight." 1997 WL 749430, at *8. *See also State v. Nelson*, No. M2023-00176-CCA-R3-CD, 2024 WL 1192985, at *16 (Tenn. Crim. App. Mar. 20, 2024) (finding that although mitigation evidence "should have been considered and addressed . . . even if the trial court ultimately assigned little or no weight to it," the trial court's sentencing determination was due deference on appeal, where record supported finding that "trial court was aware of the mitigating circumstances but implicitly rejected them"). This Court finds it safe to say in this instance that any deficient performance by trial counsel in failing to "argue and require" explicit consideration of this mitigating factor was nonprejudicial under *Strickland*, as the fact that Petitioner released the victim after kidnapping and raping her was likely implicitly rejected as a factor that the sentencing court "could [not] title" as mitigating, and, in any event, obviously had no real likelihood of altering the result of the proceeding. *Strickland*, 466 U.S. at 694. This claim of ineffective assistance is insubstantial, and therefore cannot be further considered.

## VI. CONCLUSION

For the reasons stated above, Petitioner is not entitled to relief under Section 2254. The Amended Petition will be **DENIED** and this action will be **DISMISSED**.

The Court must issue or deny a certificate of appealability ("COA") when it enters a final order adverse to a Section 2254 petitioner. Rule 11, Rules Gov'g § 2254 Cases. A petitioner may not take an appeal unless a district or circuit judge issues a COA. 28 U.S.C. § 2253(c)(1); Fed. R. App. P. 22(b)(1). A COA may issue only if the petitioner "has made a substantial showing of the denial of a constitutional right," 28 U.S.C. § 2253(c)(2). A "substantial showing" is made when the petitioner demonstrates that "reasonable jurists could debate whether (or, for that matter, agree that) the petition should have been resolved in a different manner or that the issues presented were

adequate to deserve encouragement to proceed further." *Miller-El v. Cockrell*, 537 U.S. 322, 336 (2003) (citations and internal quotation marks omitted). "[A] COA does not require a showing that the appeal will succeed," but courts should not issue a COA as a matter of course. *Id.* at 337.

Because reasonable jurists could not debate whether Petitioner's claims should have been resolved differently or are deserving of encouragement to proceed further, the Court will **DENY** a COA. Petitioner may seek a COA directly from the Sixth Circuit Court of Appeals. Rule 11(a), Rules Gov'g § 2254 Cases.

An appropriate Order is filed herewith.

_____
WILLIAM L. CAMPBELL, JR.
CHIEF UNITED STATES DISTRICT JUDGE